# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JOHN BETHEL,**

               **Plaintiff,**

**-vs-**                         **Case No.  6:05-cv-1117-Orl-28JGG**

**COMMISSIONER OF SOCIAL
SECURITY,**

               **Defendant.**

_____

# REPORT AND RECOMMENDATION

      Plaintiff John A. Bethel ["Bethel"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying Bethel's application for a period of disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set forth below, the Commissioner's decision should be **AFFIRMED**.

## I.    PROCEDURAL HISTORY

      On November 9, 2001, Bethel filed a claim for disability insurance benefits, claiming disability as of August 20, 2000 due to back and shoulder pain.  R. 51.  On August 9, 2004, the Honorable David G. Danziger, Administrative Law Judge ["ALJ"], held a hearing on Bethel's claim in Daytona Beach, Florida.  R. 323 - 73.  Attorney Joseph Quick represented Bethel at the hearing.  R. 325.  The ALJ heard testimony from Bethel and Jan May, an impartial vocational expert ["VE"].

      On December 30, 2004, the ALJ issued a decision that Bethel was not disabled and not entitled to benefits.  R. 22.  Following a review of the medical and other record evidence, the ALJ found that Bethel could not perform his past relevant work as a garbage collector or electrician.  R. 21, Finding

8.  The ALJ found that Bethel nevertheless retained the residual functional capacity ["RFC"] to perform the full range of the physical exertional requirements of light work.  R. 22, Finding 12. Applying the Medical-Vocational Guidelines, the ALJ concluded that Bethel was not disabled.[1]  R. 22, Finding 13.

After considering additional medical records, the Appeals Council denied review on June 3, 2005.  R. 4, 8.  On July 29, 2005 Bethel timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1 at 1.  On February 27, 2006, Bethel filed in this Court a memorandum of law in support of his appeal.  Docket No. 17.  On April 28, 2006, the Commissioner filed a memorandum in support of her decision that Bethel was not disabled.  Docket No. 20.  The appeal is ripe for determination.

## II.   **THE PARTIES' POSITIONS**

Bethel assigns two errors to the Commissioner.  First, Bethel claims that the Commissioner erred because the Commissioner's decision was not based on substantial evidence.  Docket No. 17 at 5.  According to Bethel, the ALJ relied solely on a single treating physician's opinions, and failed to consider and assign weight to other medical evidence from other treating sources.  *Id.* at 5 - 6.  Second, Bethel claims that the Commissioner erred by improperly evaluating Bethel's subjective complaints. *Id*. at 6.  More specifically, Bethel contends that the ALJ failed to give substantial weight to Bethel's

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation. Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

pain testimony, and that the ALJ failed to articulate specific reasons for not crediting Bethel's testimony.  *Id*. at 7.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the ALJ properly considered the evidence from all of Bethel's treating physicians and other medical sources, and that the opinions and objective evidence supports her decision to deny disability.  Docket No. 20 at 6 - 8.  Second, the Commissioner asserts that the ALJ made proper pain and credibility findings that were supported by substantial evidence.  *Id*. at 14-16.

## III.  <u>THE STANDARD OF REVIEW</u>

### A.  <u>AFFIRMANCE</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir.

-3-

1991).  The district court must view the evidence as a whole, taking into account evidence favorable

as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d

835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of

factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence

detracting from evidence on which Commissioner relied).

### B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without

remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a

Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision

fails to provide the district court with sufficient reasoning to determine that the Commissioner

properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066

(11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v.

Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the

Commissioner and order an award of disability benefits where the Commissioner has already

considered the essential evidence and it is clear that the cumulative effect of the evidence establishes

disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen

v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate

award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835,

840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting

the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

## C.      REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a

sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

**D.     STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE**

After the ALJ's decision — but before the Appeals Council decision — Bethel submitted additional medical records covering from May 14, 2004 through June 4, 2004, a treatment record dated February 22, 2005, and an MRI dated February 25, 2005.  R. 8.  If a claimant submits evidence that does not relate to the relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application."  20 C.F.R. § 404.976(b)(1)(2005).  The Appeals Council did not return the additional evidence to the claimant. Rather, the Appeals Council properly made the evidence a part of the record, and also considered the evidence in denying review.  R. 4-5, 8.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g).  The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986)

(en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues.  *Sims*, 120 S.Ct. at 2086.  When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review.  20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086;  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review.  *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council.  *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision.  *Sims*, 120 S.Ct. at 2086;  *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence.  *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).  Nevertheless, there is an important difference between *Falge* and this case — a

difference stressed by the United States Court of Appeals for the Eleventh Circuit.  In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review.  Instead he appealed only the *ALJ's decision* to deny benefits.  150 F.3d at 1324.  In this case, however, the claimant does expressly appeal and seek a reversal of the Appeals Council's decision to deny review.  Docket No. 1 at 1 ¶ 2.  The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review.  *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higginbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct. at 2086;  *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324;  *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record).  The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by

considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies. The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence. The Appeals Council's determination is subject to judicial review. The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review." *See Sims*, 120 S.Ct. at 2086; *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)); *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

## A.    DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

## B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she

is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether

a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational

-13-

opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a

-14-

wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician.  *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

-15-

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

-16-

### E.    PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.   42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.     MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may

-18-

be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

V.     **APPLICATION AND ANALYSIS**

    A.     **THE FACTS**

On November 14, 1996, Bethel visited Dr. Albert Gillespy, M.D., complaining of back and neck pain.  R. 170.  Bethel stated that he injured himself while pushing wooden electrical poles weighing approximately 3,000 pounds each.  *Id*.  Dr. Gillespy examined Bethel and reviewed Bethel's spinal MRI dated October 31, 1996.  R. 171.  Dr. Gillespy noted that the MRI revealed L4-5 and L5-S1 degenerative disc disease, but "no evidence of a herniated nucleus pulposus" and "minimal bulging disc at L5-S1."  *Id*.  Dr. Gillespy also took X-rays which revealed "no evidence of acute fracture, dislocation or subluxations."  *Id*.  The X-rays and MRI did reveal mild osteoarthritis of the hips.  *Id*.  Dr. Gillespy diagnosed Bethel with spinal strain, degenerative disc disease, and bilateral hip mild osteoarthritis; and recommended "conservative orthopaedic care [and] physical therapy with spinal rehabilitation."  *Id*.  Dr. Gillespy further stated that he anticipated that Bethel could return to work in four weeks.  *Id*.

In a follow-up visit on December 17, 1996, Dr. Gillespy found that Bethel had "good range of motion to the lumbar spine" and "[n]o significant spasm or tenderness noted in the spine area."  R. 169.  Bethel stated that he was "doing well" and had "no complaints of back or leg pain."  *Id*.  Dr.

-19-

Gillespy recommended discontinuing physical therapy as Bethel had reached maximum medical improvement[3] with a 0% whole person permanent partial impairment rating.  *Id*.

Bethel returned to Dr. Gillespy on March 3, 1997, complaining that his back, neck, right arm, and right leg pain had returned intermittently after his prior office visit.  R. 168.  X-rays of the cervical and lumbar spine showed no change from the previous x-ray studies.  *Id*.  Dr. Gillespy recommended an MRI scan of Bethel's brain, and a possible neurological or neurosurgical evaluation.  *Id*.

On March 24, 1997, Bethel underwent a brain and cervical spine MRI.  R. 165-67.  The brain MRI was negative.  R. 167.  The cervical spine MRI revealed a small C5-6 ventral disc bulge; C2-3, C3-4, C4-5, C5-6, C6-7 and C7-T1 disc desiccation; and a straightening of the cervical spine which was probably secondary to muscle spasm.  R. 166.  On April 7, 1997, Dr. Gillespy again examined Bethel.  R. 164.  After reviewing the March 24, 1997 MRI scan, Dr. Gillespy disagreed with the "diagnosis of the patient's having degenerative disc disease from C2 to T1" and interpreted the bulging disc at C5-6 as "minimal."  *Id*.  In his examination, Dr. Gillespy noted that Bethel had decreased tenderness along the cervical spine, and that Bethel reported that his pain was "improved." *Id*.  Dr. Gillespy recommended conservative care, and noted that Bethel "may return to work full duty."  Dr. Gillespy further recommended a follow-up evaluation in four months.  *Id*.

On June 24, 1997, Bethel returned to Dr. Gillespy complaining of increased pain in his back and pain radiating into his left buttock.  R. 163.  Dr. Gillespy's impressions remained unchanged, and

---

[3]Black's Law Dictionary defines "maximum medical improvement" as "[t]he point at which an injured person's condition stabilizes, and no further recovery or improvement is expected, even with additional medical attention." BLACK'S LAW DICTIONARY 1000 (8th ed. 2004).

maintained that Bethel could return to work full duty.  Id.  Dr. Gillespy prescribed Darvocet and

Dolobid, and recommended a short course of physical therapy to the lumbar spine.  *Id.*

On August 14, 1998, Bethel returned to Dr. Gillespy complaining of neck pain and back pain

that radiated into his right leg.  R. 161.  X-rays of the cervical and lumbar spine showed no change

from the previous X-ray studies.  *Id.*  Dr. Gillespy's impressions remained unchanged, and he

maintained that Bethel could return to work full duty.  *Id.*  Dr. Gillespy also recommended a

Myelogram and CT scan of Bethel's cervical and lumbar spine. *Id.*

On September 8, 1998, Bethel underwent a myelogram which suggested mild ventral

impressions on the thecal sac at C4-C5 and C5-C6, as well as L3-L4 and L4-S1 which may be related

to mild disc bulges.  R. 158.  The cervical CT scan revealed changes suggesting a slight central disc

bulge at C4-C5, but otherwise showed "no disc protrusion . . . at any level."  R. 159.  The lumbar CT

scan revealed mild symmetric disc bulges at L3-L4 and L4-S1 levels, but, like the cervical scan,

revealed no disc protrusion at any level.  R. 160.

On September 14, 1998, Dr. Gillespy reviewed the myelogram and CT scan, and diagnosed

1.) spinal strain; 2.) C4-5 minimal bulging disc; 3.) L4-5, L5-S1 degenerative disc disease; and 4.)

bilateral hip mild osteoarthritis.  R. 157.  Dr. Gillespy found that Bethel had a 0% permanent

impairment rating; stated that Bethel could continue to work full duty; and noted that he had "nothing

further to offer" Bethel as a patient.  *Id*.

On September 21, 1999, Bethel returned to Dr. Gillespy complaining of pain in his back, right

leg, and right thigh.  R. 156.  Dr. Gillespy found that Bethel had tenderness in the lower lumbar spine

area, and recommended an MRI scan of the lumbar spine.  *Id*.  An MRI of the lumbar spine dated

September 28, 1999 revealed degenerative disc disease at L4-L5 and L5-S1 (which was worse at L4-L5) with moderate spinal stenosis due to facet complex hypertrophy.  R. 155.

Bethel claims disability as of August 20, 2000 due to back and shoulder pain.  R. 51.  On August 28, 2000, Bethel visited Dr. Gillespy with complaints of right shoulder pain.  R. 152.  Bethel stated that he injured his shoulder while lifting a refrigerator into a garbage truck at work.  *Id*.  He complained of pain throughout the right shoulder, and reported having difficulties raising his arm upwards and getting dressed.  *Id*.  Dr. Gillespy's impression was right shoulder bursitis/tendinitis; adhesive capsulitis ("frozen shoulder"); possible rotator cuff tendon tear; right shoulder mild osteoarthritis; and impingement syndrome.  R. 154.  Dr. Gillespy recommended an MRI and physical therapy.  R. 154.

An MRI of Bethel's right shoulder dated September 11, 2000 revealed rotator cuff tendinitis, low lying acromion process (that was not impinging upon the rotator cuff) and minimal acromioclavicular joint degenerative disease.  R. 139.  Bethel returned to Dr. Gillespy on September 19, 2000, with complaints of right shoulder pain, especially while conducting overhead physical activity.  R. 137. Dr. Gillespy recommended surgery, and noted that Bethel could work "modified duty, with restrictions of no lifting involving his right shoulder."  *Id*.  On another visit on September 29, 2000, Dr. Gillespy found  no change in Bethel's condition.  R. 136.

On October 6, 2000, Bethel saw Dr. S. R. Sridhar, M.D., for a second opinion on his right shoulder surgery. 117 - 20.  Examination of the right shoulder revealed some discomfort over the anterior aspect of the shoulder.  R. 118.  Dr. Sridhar noted "definite pain and painful arc on range of motion, especially with the arm coming down rather than going up."  *Id*.  Dr. Sridhar further noted that

Bethel had some weakness to external rotation and internal rotation of the right shoulder against resistance, but particularly external rotation associated with pain. *Id.* The impression was rotator cuff impingement syndrome with a possible underlying rotator cuff tear. R. 119. The MRI, however, did not show any clear cut full thickness rotator cuff tear. *Id.* Dr. Sridhar maintained that Bethel was unable to perform repetitive activity with the right upper extremity. R. 120. In his recommendations, Dr. Sridhar questioned Bethel's scheduled surgery: "I do not believe there is any contraindication to surgery that Dr. Gillespy plans. It is the undersigned's practice, however, to treat patients conservatively for several weeks, especially with a shoulder problem, prior to embarking on surgical intervention." *Id.*

On October 25, 2000, Bethel underwent surgical repair of a torn rotator cuff performed by Dr. Gillespy. R. 132 - 33. On February 2, 2001, Dr. Gillespy recommended discontinuation of post-surgery physical therapy. R. 128. Dr. Gillespy also stated that Bethel could return to work, but could lift no more than thirty pounds and had to avoid repetitive overhead activity. R. 128.

On May 3, 2001, Dr. Gillespy recommended an MRI of Bethel's cervical spine due to possible right-sided cervical radiculitis causing pain to radiate down the right arm. R. 127. An MRI of the cervical spine dated May 16, 2001 was normal, except for mild aging changes. R. 126. On June 26, 2001, Dr. Gillespy reviewed the MRI, and noted that it showed "no neurocompressive pathology." R. 125.

Dr. Gillespy continued to treat Bethel until September 18, 2001. R. 121 - 31. Dr. Gillespy released Bethel with a diagnosis of right shoulder impingement syndrome and osteoarthritis of the acromioclavicular (AC) joint, resulting in a 4% permanent partial impairment. R. 121. Dr. Gillespy

-23-

restricted Bethel to work lifting no more than 30 pounds and avoiding repeated overhead reaching. *Id*.

On October 30, 2001, Bethel underwent a court-ordered functional capacity assessment with physical therapist Marie C. Yu.  R. 223 - 33.  Ms. Yu determined that Bethel could occasionally lift 12.5 pounds, with standing, walking, sustained bending, overhead reaching, squatting, kneeling, stooping, sustained and repetitive reaching and pushing/pulling on an occasional basis with position changes as needed.  R. 223.  Bethel refused to perform crawling, crouching, and ladder climbing.  *Id*. Further, Bethel discontinued the trunk bending, overhead reaching, squatting, stooping, trunk twisting, forward reaching, and pushing/pulling activities because of back pain.  R. 230-31.

Bethel saw Robert Hatch, M.D.  from November 6, 2001 to January 17, 2002 for treatment of his right shoulder.  R. 234 - 37.   On November 6, 2001, Dr. Hatch noted tenderness at the anterior deltoid and region of the biceps long head and the region of the conjoined tendon, but that there was no shoulder instability and negative impingement. R. 237.  Dr. Hatch diagnosed "right shoulder post operative pain – etiology unclear." *Id*.  Dr. Hatch injected Bethel's shoulder area with Marcaine, but noted that the treatment failed to reduce the shoulder pain.  *Id*.   Bethel's complaints remained unchanged during his next visits.  R. 234 - 36.  In his report dated November 19, 2001, Dr. Hatch recommended that Bethel "perform no manual labor with the right shoulder but otherwise may work full time." R. 236.  On January 17, 2002, Dr. Hatch's diagnosis remained "continued right shoulder pain – etiology unclear – consider tendinopathy."  R. 234.  Dr. Hatch further  noted that "[Bethel] is at maximum improvement, as I have no other treatments to offer . . .  I estimate a right shoulder impairment rating of 3% and a whole person impairment of 2%." *Id*.

-24-

On March 11, 2002, Gerald Woodard, D.O., performed a consultative examination of Bethel. R. 238 - 42. The examination revealed crepitance (crackling sounds) and decreased range of motion in the right shoulder and decreased range of motion and mild muscle spasm in the cervical and lumbar spine. R. 241. Bethel's motor examination revealed "no deficits in gait, grip strength, or fine manipulation," but Dr. Woodard noted that Bethel's gait favored the right leg and that Bethel was unable to heel, toe or tandem walk. *Id*. Dr. Woodard's impressions included degenerative disc disease of the lumbar spine resulting in decreased motion, and "status post right rotator cuff repair" with decreased range of motion in the right shoulder. *Id*. On the final page of his report, Dr. Woodard commented that Bethel did not "appear to give maximum effort on any range of motion testing" and that he appeared to "exaggerate the degree of pain and discomfort demonstrated." R. 242. Dr. Woodard observed that Bethel walked with a noticeable limp during the examination, but walked "much more briskly outside with minimal apparent discomfort." *Id*.

On April 22, 2002, John Ortolani, M.D. evaluated Bethel, noting swelling about the right acromioclavicular joint, as well as tenderness and reduced range of motion. R. 252. The examination also revealed weakness in the right tricep muscle and in the grip of the right hand. *Id*. Dr. Ortolani opined that Bethel had only 50% to 60% abduction in the right arm without severe pain, and, when combined with the weak muscles, resulted in a 12% impairment to the right arm, and a 7% impairment as a whole. R. 253. Dr. Ortolani recommended "light duty," restricting lifting weights of ten pounds or less with the right arm – but also commented that Bethel's neck and back problems made his ability to work "significantly impaired" and that Bethel would "only be able to do sedentary work." *Id*.

Hugh Coleman, D.O., evaluated Bethel on November 27, 2002 at the request of the Office of Disability Determinations.  R. 254-57.  Bethel complained of lower back pain radiating to the hips, neck pain occasionally radiating to the right shoulder and right shoulder pain.  R. 254.  Dr. Coleman's report to the Florida Department of Health, dated the day of the examination, included Bethel's statements that  he could brush his teeth and hair, tie his shoes, and button and unbutton his shirts, but that he could not "lift over his head due to the pain and limited motion."  *Id*.  During the examination, Bethel's grip strength measured 5/5 bilaterally, and Dr. Coleman noted that his fine manipulation was in normal limits.  R. 256.  Dr. Coleman assessed chronic lower back pain, lumbar degenerative disc disease and limited range of motion in the right shoulder.  R. 257.  In the comments section at the end of the letter, Dr. Coleman  noted that Bethel was "guarding against examination."  *Id*.

On May 11, 2003, Bethel went to the Halifax Medical Center Emergency Room complaining of lower back pain.  R. 270.  The treating physician found Bethel's back in "good alignment" but with discomfort in the paravertebral region bilaterally.  *Id*.  Bethel left the hospital with prescriptions for Soma with Codeine and Dolobid.  Bethel returned to the Halifax Medical Center on  September 11, 2003.  R. 272.   The treating physician noted that Bethel's spine showed no obvious sign of trauma, was not tender, and that Bethel had "diffuse muscle tenderness across [his] lower back."  *Id*. The physician diagnosed acute exacerbation of chronic back pain, and prescribed Dolobid and Robaxin.  R. 272 - 73.  The physician recommended that Bethel rest and perform no heavy lifting.  *Id.*

On March 8, 2004, Bethel underwent an MRI of the right shoulder that revealed mild AC joint arthritis, postoperative changes, and minimal inflammation in the subacromial bursal region – with no sign of rotator cuff tear.  R. 276.  Bethel's right shoulder joint showed subtle changes of

-26-

degenerative arthritis.  R. 277.  Radiologists reviewing the MRI compared the scans with Bethel's

September 11, 2000 MRI study.  *Id.*  The radiologists noted that Bethel's rotator cuff tendinosis had

resolved, and that the new MRI showed "no other significant interval changes."  *Id*.

      On March 18, 2004 Bethel sought treatment with Ramin Bonnett, D.O. for right shoulder pain

and numbness in his hands.  R. 295.  Dr. Bonnett noted neck pain and back pain.  *Id.*  However,

straight leg raising was negative, and there was no tenderness to palpation.  *Id*.  On March 25, 2004,

Bethel visited Dr. Bonnett again for shoulder pain and decreased range of motion.  R. 291.  During

this visit, Bethel underwent a nerve block injection to the right shoulder and physical therapy.  *Id*.  Dr.

Bonnett noted that Bethel had no other complaints, and that leg raising was negative and Bethel's back

had no vertebra point tenderness.  R. 290.   Bethel returned to Dr. Bonnett on May 14, 2004,

complaining of pain in the back going down to the right lower extremity.  R. 318.  Leg raising was

positive and Bethel's back had vertebral point tenderness.  *Id*.  Dr. Bonnett diagnosed lumbar

radiculopathy and ordered an MRI.  *Id*.  An MRI of Bethel's lumbar spine dated May 14, 2004

revealed mild progression of the concentric disc bulge at L4-L5 and L5-S1 with a moderate stenosis

of the inferior aspect of the L4-L5 disc space and a concentric disc bulge at L4-L5.  R. 278.

      The ALJ conducted Bethel's hearing on August 9, 2004.  R. 323-73.  At the hearing, Bethel

testified that he had lower back pain which radiated down the right leg, and further testified that while

sitting in the hearing, the severity of his pain was eight or nine out of ten. R. 342, 345.  Bethel stated

that because of his right shoulder pain, he could lift objects weighing between ten and fifteen pounds

with his right hand, but could not lift anything over his head.  R. 346.  Bethel maintained that he had

no problems with his left hand.  R. 347.  Regarding the physical limitations posed by his back pain,

Bethel stated that he could walk twenty-five yards and could stand for approximately ten minutes, before having to sit down because of his lower back pain.  R. 353-54.  Bethel further stated that he could only sit for ten to fifteen minutes before having to stand up again.  R. 354.  Bethel testified that he was able to bathe himself, comb his hair, wash dishes, do his own laundry, and cook for himself. R. 355 - 57.

Bethel submitted the following additional evidence to the Appeals Council.  Dr. Bonnett reviewed Bethel's MRI on May 21, 2004, and noted that "there [was] disc bulging and degeneration caused by radiculopathy" and it looked like Bethel was "getting  worse when compared to 1999."  R. 317.  On June 4, 2004 Bethel returned to Dr. Bonnett for a follow-up visit.  R. 315-16.  Dr. Bonnett noted that Bethel's shoulder was "getting better" and that home EMS therapy was helping.  R. 315. Bethel's back pain had not improved, and Dr. Bonnett prescribed Ultracet, Vioxx and Naprosyn, and recommended injections and a neurosurgical evaluation if Bethel's pain continued.  R. 316.  On February 25, 2005, an MRI of the lumbar spine revealed annular disc bulge at L4-L5 level with borderline spinal stenosis and degenerative disc disease at L4-L5 and L5-S1 with annular bulges showing high intensity zones which may be indicative of annular tears.  R. 305 - 06.

### B.    THE ANALYSIS

Bethel contends that the ALJ's decision was not based on substantial evidence.  Docket No. 17 at 5.  According to Bethel, the ALJ relied primarily on treating physician Dr. Gillespy's opinions, even though Dr. Gillespy "only treated [Bethel] for his shoulder injury and rendered no opinions regarding [Bethel's] back injury and limitations."  *Id*.  Bethel further argues that the ALJ failed to discuss Dr. Ortolani's April 22, 2002 examination, and also failed to mention Dr. Bonnett's May 21,

-28-

2004 review of MRI films in which Dr. Bonnett observed that Bethel's back condition had worsened since 1999.  *Id*. at 6.  The Commissioner argues that Bethel's contentions regarding the basis of the ALJ's decision are without merit, and points out that the ALJ did in fact discuss Dr. Ortolani's and Dr. Bonnett's reports in addition to Dr. Gillespy's.  Docket No. 20 at 8 - 9.

        Contrary to Bethel's assertions, the record shows that the ALJ discussed Dr. Ortolani's examination and specifically noted Dr. Ortolani's opinion that Bethel "was suited for sedentary work."  R. 17.  Further, while Bethel is correct that *the ALJ* did not consider Dr. Bonnett's May 21, 2004 report which interpreted the May 14, 2004 MRI, he is incorrect that this was a failure on the part of the ALJ.  Dr. Bonnett's report was not part of the record at the time of the ALJ's decision, and the Appeals Council claims to have considered it.  However, the Commissioner's contention that the May 21, 2004 report, by virtue of it being submitted after the ALJ hearing, should not be considered by this Court is also incorrect. *See* Docket No. 20 at 9 n.3. The Appeals Council's denial of review is a final decision of the Commissioner that is subject to review under 42 U.S.C. § 405(g).  *Williams*, 407 F. Supp. 2d at 1302-03.

        Nevertheless, this Court finds no error in the Appeals Council's evaluation of Bethel's new evidence.  First, the ALJ reviewed the May 14, 2004 MRI film upon which Dr. Bonnett's subsequent report was based, and remarked that the MRI showed "mild disc bulging."  R. 18.  Dr. Bonnett's May 21, 2004 report essentially restates the May 14, 2004 MRI impressions which the ALJ considered.  The initial MRI reading showed "mild progression of the [disc bulge] which is slightly more pronounced than in the [1999] exam."  R. 278.  Dr. Bonnett held the similar opinion that  "there [was] disc bulging and degeneration" and that it looked like Bethel was "getting worse" compared to the

1999 MRI.  R. 317.  Nothing in Dr. Bonnett's reiteration supports the contention that the Appeal's

Council should have granted review, or that Bethel is disabled.

Bethel's arguments regarding the ALJ's over-reliance on Dr. Gillespy's opinions are without

merit, particularly the assertion that the ALJ "[failed] to recognize that Dr. Gillespy only treated

[Bethel] for his shoulder injury."  Docket No. 17 at 5.  As early as 1996, Dr. Gillespy treated Bethel

for back and neck problems — which involved reviewing spinal MRIs and X-rays.  R. 171.  In 1997,

Dr. Gillespy again ordered a spinal MRI and prescribed Darvocet and Dolobid and recommended a

short course of physical therapy to the lumbar spine.  R. 163.  In 1998, Dr. Gillespy ordered and

reviewed a CT scan and myelogram of Bethel's cervical and lumbar spine.  R. 157.  In 1999, Dr.

Gillespy ordered yet another spinal MRI.  R. 156. It was not until 2000 that Bethel presented with his

right shoulder injury – and even after this, Dr. Gillespy continued to treat Bethel for his back, ordering

another cervical spine MRI in 2001. R. 127.  The ALJ noted this last cervical spine MRI – which was

negative except for normal signs of aging – in his decision.  R. 17.

Further, Dr. Gillespy was Bethel's *treating* physician for almost five years.  As a result, the

ALJ was justified in assigning great weight to Dr. Gillespy's opinions.  Moreover, the ALJ was

required to give them controlling weight because the opinions were not inconsistent with the other

substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2).  Though it would have been preferable

for the ALJ to specifically state that he was giving "controlling" weight to Dr. Gillespy's opinions,

he nonetheless articulated that Dr. Gillespy's opinions were "consistent with the weight of the medical

evidence on record."  R. 18-19.  The ALJ thoroughly considered the opinions of Drs. Hatch, Woodard,

Ortolani, Coleman, and Bonnett, and properly found that Bethel was "severely" impaired by his

-30-

degenerative disc disease and post-status right rotator cuff repair. R. 17-18.  The ALJ expressly found Dr. Gillespy's opinions to be consistent with the medical evidence, and considered Bethel's entire medical condition, there is no error in the ALJ giving controlling weight to Dr. Gillespy.  *See Dyer v. Barnhart*, 395 f.3d 1206, 1211 (11th Cir. 2005); *Foote*, 67 F.3d at 1558.  Moreover, the Appeals Council did not err in denying review.

Bethel also argues that the ALJ failed to state the weight given to the medical evidence other than Dr. Gillespy's opinion, and specifically presents Dr. Ortolani's and Dr. Bonnett's opinions as examples of unweighed evidence.  Though an ALJ with unlimited time might have been more particular in apportioning weight to the various opinions, by giving controlling weight to Dr. Gillespy, the ALJ necessarily defined the weight given to the other opinions.  Further, the record supports the ALJ's implicit finding that Dr. Ortolani's and Dr. Bonnett's opinions were entitled to less weight than Dr. Gillespy's.  *See Foote*, 67 F.3d at 1562.

Dr. Ortolani saw Bethel only once, was not a treating physician, and assessed Bethel with only a 7% whole person impairment. R. 253.  Dr. Ortolani also made no independent diagnoses of Bethel's back condition, and all of his notes regarding Bethel's back and neck problems are unsupported by his own observations.  Further, the final paragraph of Dr. Ortolani's report states that Bethel "is able to return to work in a light duty capacity" with limitations on lifting with his right arm and then.  In a conclusory fashion, Dr. Ortolani then limits Bethel to sedentary work because of back and neck problems.  *Id*.  The ALJ and Appeals Council properly disregarded internally inconsistent and conclusory determinations made by Dr. Ortolani regarding the severity of Bethel's back impairment.  *See Edwards*, 937 F.2d at 583-84.

Dr. Bonnett's opinions are essentially consistent with Dr. Gillespy's, and not entitled to greater weight. Dr. Bonnett found that Bethel suffered from back, neck, and shoulder pain, just as Dr. Gillespy did. Dr. Bonnett's treatments included nerve block injections and EMS therapy for Bethel's shoulder, but Dr. Bonnett never prescribed any working, weight, or movement restrictions. Even if Dr. Bonnett's opinions were significantly contrary to Dr. Gillespy's, the ALJ's decision to afford more weight to one treating physician over another would still be proper. *See* 20 C.F.R. § 404.1527(d);[4] *Bell v. Bowen*, 796 F.2d 1350, 1354 (11th Cir. 1986); *Watson v. Heckler*, 738 F. 2d 1169, 1172 (11th Cir. 1984).

In the reports submitted after the ALJ hearing, Dr. Bonnett noted that Bethel's back pain appeared to be getting worse, but that Bethel's shoulder was improving with therapy. R. 315-16. Dr. Bonnett continued to prescribe medication and EMS therapy, but still did not place any physical limitations on Bethel. R. 316. The February 25, 2005 spinal MRI, also submitted after the ALJ hearing, again revealed disc-bulges and degenerative disc disease — but neither Dr. Bonnett nor any other treating physician reviewed this MRI or compared these findings with earlier MRIs. Further,

---

[4]As stated earlier, 20 C.F.R. § 404.1527(d) provides that when a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d).

Here, four out of the six factors for weighing a treating physician's opinion indicate that the ALJ was right to accord more weight to Dr. Gillespy's opinions. First, Dr. Gillespy treated Bethel for five years, whereas Dr. Bonnett treated Bethel for less than one year. Second, Dr. Gillespy treated Bethel for both his back and shoulder, performing surgery on the latter, while Dr. Bonnett treated only Bethel's shoulder for the first three months – and his subsequent treatment of Bethel's back was limited to continued therapy and prescribing painkillers. Further, the record shows that Dr. Gillespy ordered and reviewed five MRIs, a CT scan, a Myelogram, and took two sets of X-rays in the five years of Bethel's treatments, Dr. Bonnett, on the other hand, ordered and reviewed one MRI. Finally, Dr. Gillespy is an orthopaedic specialist, whereas Dr. Bonnett is a primary care physician.

the indications and impressions in the February 25, 2005 MRI are substantially the same[5] as those of the May 14, 2004 MRI, which the ALJ specifically referenced in his decision.  R. 18.  In short, none of the later evidence undermines the ALJ's findings or conclusions.  The evidence does not support the contention that the Appeals Council erred in denying review.  *See Keeton*, 21 F.3d at 1066, 1068.

Bethel's second argument is that the Commissioner failed to properly evaluate Bethel's subjective pain testimony.  Bethel reiterates that the ALJ mistakenly relied upon Dr. Gillespy's opinion because "Dr. Gillespy did not render any treatment regarding [Bethel's] back condition." Docket No. 17 at 6.  The Commissioner argues that the ALJ considered and discussed the objective medical evidence along with Bethel's subjective testimony and made a proper pain determination. Docket No. 20 at 14.

Even a cursory reading of the record shows that Bethel's assertions that Dr. Gillespy never treated Bethel for his back are incorrect.  In fact, according to Bethel's own testimony, Dr. Gillespy was the first doctor to treat Bethel for his back and to prescribe him a cane.  R. 348.  Further, the ALJ did not rely solely on Dr. Gillespy's opinions when evaluating Bethel's subjective pain testimony.  The ALJ found Bethel's testimony "inconsistent with the weight of the evidence, *including* the assessment by Dr. Gillespy, his treating physician."  R. 19 (emphasis added).  As noted above, the ALJ reviewed the opinions of Dr. Ortolani and Dr. Bonnett.  Additionally, the ALJ considered the May 14, 2004 MRI ordered by Dr. Bonnett, which described "mild progression" in Bethel's lumbar disc bulges along

_____

[5]The only marked difference evident in the February 25, 2005 MRI is the mention of high intensity zones which *might* indicate annular tears.  R. 306 (emphasis added).  No later tests, evaluations or opinions  regarding annular tears exist in the record.  Bethel's earlier CT scan and myelogram, however, did not reveal annular tears, nor did any previous MRI.

with "slightly more pronounced" arthritis. R. 278. The MRI further revealed that the L5-S1 disc bulge only "moderately narrowed" the right neural foramen. *Id.*

Though the ALJ did not specifically cite *Holt*, the ALJ did apply the proper pain standard, and found that the mild progression of Bethel's back condition as shown in the May 14, 2004 MRI and other record evidence could not reasonably be expected to give rise to the "intensity and persistence" of his pain and other symptoms. R. 19. Thus, there was no error in the ALJ's determination that the severity of the pain as described in Bethel's testimony cut against the weight of this objective evidence. *See Holt*, 921 F.2d at 1223; *Wilson v. Barnhart*, 284 F.3d 1219, 1226 (11th Cir. 2002). And, as noted above, the new evidence submitted to the Appeals Council is materially consistent with that considered by the ALJ. The Appeals Council did not err in denying review.

Regarding Bethel's credibility, the ALJ specifically noted that he was taking into account Dr. Coleman's observation that Bethel "guarded against examination" as well as Dr. Woodard's observation that Bethel exaggerated his pain and limped more noticeably when observed. R. 17. The ALJ articulated a specific credibility finding that is supported by substantial evidence and will not be disturbed. *See Foote,* 67 F.3d at 1561-62.

## VI.   <u>CONCLUSION</u>

For the reasons stated above, the decision of the Commissioner should be **AFFIRMED**. Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and

shall bar an aggrieved party from attacking the factual findings on appeal.

   **DONE AND ORDERED** this 17th day of November, 2006.

                                              JAMES G. GLAZEBROOK
                                         UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

The Honorable John Antoon, II
United States District Judge

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

The Honorable David G. Danziger
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817